UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | |
| v. | Case No. 11-cr-40014-JPG |
| PETRE D. WASHINGTON, | |
| Defendant. | |

## MEMORANDUM AND ORDER

This matter comes before the Court on defendant Petre D. Washington's motion to suppress evidence obtained pursuant to a stop, search and seizure on October 24, 2010, along with all the fruits of that "poisonous tree" (Doc. 47). The Government has responded to the motion (Doc. 49), and Washington has replied to that response (Doc. 51). The Court held a hearing on the motion on October 4, 2011. Washington called as witnesses in his case Carbondale Police Sergeant Anthony Williams and investigator Gail Jones; the Government called Carbondale Police Detective Adam Boyd.

At about 2 in the morning on October 24, 2010, Williams and Boyd performed a *Terry* stop and found a loaded firearm on Washington's person. Washington claims they had no reasonable suspicion of criminal activity and that the stop, search and seizure of the gun violated his Fourth Amendment rights. Washington is charged in this case with one count of knowingly possessing a firearm after being convicted of a felony in violation of 18 U.S.C. § 922(g)(1).

## I.     Facts

The Court found the witnesses to be credible based on their demeanor while testifying, the foundations they had for testifying to certain facts and the consistency of each witness's testimony with other evidence in the case. The evidence in the file and at the hearing established

the following facts.

In the early morning hours of October 24, 2010, Williams, who has had special training and experience in street crime, was on foot patrol near the Don Taco restaurant parking lot on Grand Avenue in Carbondale shortly after several neighboring bars had closed for the evening. He believed this area at this time of night was a high crime area. An unidentified man approached him and reported that a very large (but not obese) black male wearing a black jacket with a white tee shirt underneath had retrieved a gun from under the hood of a purple chameleon-colored[1] car parked in the parking lot and put the gun in his waistband. The informant walked with Williams to the Don Taco parking lot and pointed out the car, which matched the description he had given earlier. The informant said he did not see the person he had seen retrieve the gun. The informant's behavior led Williams to believe he was not intoxicated and did not want to be observed talking to a law enforcement officer. Williams asked the informant to give his name, but he refused, did not give any further information to identify the suspect, and left the scene.

Williams approached the car and asked the only two people standing near the car – two black men, one in a black shirt, one in a black jacket and both obese and tall – if the car was theirs, but they said no. He also asked them if they had any guns, and they said no and consented to a pat-down search. The searches yielded no weapons.

Williams then looked into the car from the outside and thought he saw a black jacket in the car, although it turned out later to be a gray sweatshirt. This led Williams to believe the suspect may have shed his jacket and placed it in the car. He also noticed Washington, a large

---

[1]The car was painted with a paint that changed colors depending on the light and the angle from which it was viewed.

but not obese black man wearing a white tee shirt but not a black jacket, intently looking at him from the corner of the Don Taco building. After Williams and Washington locked eyes, a Don Taco security guard Matt Stubblefield told Williams that Don Taco patrons had in the past told him and other Don Taco security guards to watch out for Washington.

When Williams began to walk towards Washington, Washington turned to walk behind the corner of the Don Taco building and away from Williams. Williams called for Boyd and other officer to go with him, and as they rounded the corner of Don Taco, Washington quickened his pace and turned around to glance at the officers following him. Williams and Boyd thought Washington was checking to see if they were pursuing him. Washington stopped when Williams asked him to, and Williams asked Washington if the purple car was his and if he had a gun. Washington did not make eye contact with Williams, dropped his eyes to the front left side of his waistband and worked his hands towards his pockets. At that point, Williams decided to conduct a pat-down search. Williams grabbed Washington's hands while Boyd patted down Washington's waistband area and located the gun that is the basis of this prosecution.

The events described above occurred in fairly rapid success and took no more than five minutes in total. No black jacket was ever found on Washington's person, in his car or in the Don Taco parking lot area.

## II.    Analysis

### A.    <u>Legal Standard</u>

This issue here is whether, considering the totality of the circumstances, Williams had reasonable suspicion of criminal activity to justify his stopping and patting-down Washington for a weapon. The Fourth Amendment to the Constitution provides, in pertinent part, that the "right of the people to be secure in their persons, houses, papers and effects, against

unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Where evidence is obtained in violation of this guarantee, the exclusionary rule generally requires the evidence to be suppressed at a criminal trial where the utility of the rule in deterring unconstitutional police behavior outweighs its costs. *See Brock v. United States*, 573 F.3d 497, 499-500 (7th Cir. 2009).

The Fourth Amendment requires that searches and seizures, even those of a very short duration, be founded on an objective justification. *United States v. Mendenhall*, 446 U.S. 544, 551 (1980). The seizure in this case was an investigatory stop, also called a *Terry* stop, named for *Terry v. Ohio*, 392 U.S. 1 (1968), the seminal Supreme Court case addressing the issue. An investigatory stop is a brief, non-intrusive detention that may include a moderate number of questions to determine identity and whether criminal activity is afoot as well as a pat-down search. *Florida v. Royer*, 460 U.S. 491, 498-99 (1983); *United States v. Felix-Felix*, 275 F.3d 627, 633 (7th Cir. 2001) (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *United States v. Feliciano*, 45 F.3d 1070, 1072 (7th Cir. 1995)).

To justify an investigatory stop, an officer must have "specific, articulable facts that give rise to a reasonable suspicion of criminal activity." *Felix-Felix*, 275 F.3d at 633; *Terry*, 392 U.S. at 21. "The determination of whether the officer had reasonable suspicion is an objective inquiry based on the totality of the circumstances known to the officer at the time of the encounter." *United States v. Hicks*, 531 F.3d 555, 558 (7th Cir. 2008). However, it is not necessary that a crime *actually* have been committed, just that a crime *may* have occurred or *may* be occurring. Even facts susceptible of an innocent construction will support a *Terry* stop as long as the totality of the circumstances are such that a reasonable officer could infer that the person stopped *may* be involved in criminal activity. *United States v. Raibley*, 243 F.3d 1069,

1074 (7th Cir. 2001). "During a *Terry* stop, a law enforcement officer can conduct a protective pat-down search only if the officer has 'at a minimum some articulable suspicion that the subject is concealing a weapon or poses a danger to the [officer] or others . . . .'" *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010) (quoting *United States v. Pedroza,* 269 F.3d 821, 827 (7th Cir. 2001)). If a *Terry* stop or pat-down search is not sufficiently justified, evidence obtained as a result of the illegal seizure is subject to suppression.

      B.      <u>Application to this Case</u>

Washington argues that (1) the informant's tip did not provide reasonable suspicion because it lacked indicia of reliability and was not corroborated by independent evidence, (2) the informant's description was too vague and generally applicable to provide reasonable suspicion; (3) Washington's behavior in walking away was perfectly innocent and (4) the *Terry* stop was based solely on race since Washington, who was not wearing a black jacket, did not meet the clothing description given by the informant. The Government notes that (1) the informant's statement alone would have provided reasonable suspicion for the *Terry* stop and (2) considering the totality of the circumstances, the stop was justified.[2]

Depending on the circumstances, anonymous tips alone may or may not provide reasonable suspicion for a *Terry* stop. The Supreme Court held in *Florida v. J.L.*, 529 U.S. 266 (2000), the primary case on which Washington relies, that an anonymous tip does not establish reasonable suspicion unless it has sufficient indicia of reliability as to the likelihood of criminal

---

[2]The Government also argues that the stop was justified because Washington had signed an agreement to consent to be searched as part of his conditions of parole. This argument is misplaced because Washington never refused to consent to a search. Furthermore, any breach of contract that may have occurred had he refused to consent is irrelevant to whether the officers in this case had reasonable suspicion for a *Terry* stop.

activity.  *Id.* at 270.  Indicia of reliability can include the informant's accurate predictions of otherwise not easily predicted movements of the suspect (which shows the informant had inside knowledge of illegal activity), *see Alabama v. White,* 496 U.S. 325, 332 (1990) (an admittedly "close case"), a past history of accurate anonymous tips from a caller with the same voice, *J.L.*, 529 U.S. at 275 (Kennedy, J., concurring), or police corroboration of "enough of the tipster's information to imply that the tipster must possess inside knowledge about the details that the police could not otherwise observe,"  *United States v. Wooden*, 551 F.3d 647, 649 (7th Cir. 2008).  Additionally, eyewitness reports of a crime in progress that needs an immediate response generally do not need corroboration or a history of reliability before they can be deemed reliable enough to support reasonable suspicion.  *Id.*  On the other hand, "[a]n accurate description of a subject's readily observable location and appearance" is not a strong indicia of reliability because it provides no evidence the informant knows about any concealed criminal activity. *J.L.*, 529 U.S. at 771.

Cases discussing the factual support necessary for a tip to create reasonable suspicion provide some guidance as to what would be sufficient in this case.  *J.L.* is the Supreme Court's clearest pronouncement on the question of anonymous tips.  In *J.L.*, the Supreme Court found that an anonymous phone call telling the police that a young black man in a plaid shirt at a bus stop had a gun in a state where carrying a concealed gun was not illegal, without any explanation of how the informant knew this information, any corroborating information or any indication that the situation was an emergency or an ongoing violation of the law, did not have sufficient indicia of reliability to create reasonable suspicion to search the young man in the plaid shirt.  *Id.* at 271.

On the other end of the spectrum is *Bullock*, in which an anonymous tip was corroborated

and therefore supported a reasonable suspicion finding. There, the anonymous informant stated he had been in a specific house, had spoken to the subject there, and knew the subject was conducting illegal drug activities there. Law enforcement corroborated the drug activity by surveilling the subject after the tip and observing behavior indicative of drug activity. *Bullock*, 632 F.3d at 1008-09. The combination of the anonymous tip and the corroborating surveillance gave rise to reasonable suspicion to detain the subject, although the tip alone would not have. *Id.* at 1011-12.

The level of urgency for police action is a key factor in whether a tip alone provides reasonable suspicion. In fact, *United States v. Drake*, 456 F.3d 771, 775 (7th Cir. 2006), created a presumption of reliability for "an eyewitness 911 call reporting an emergency situation for purposes of establishing reasonable suspicion." Also, in *Wooden*, a caller left an anonymous tip in a 911 call saying he had observed a tall black male in a certain public location dressed a certain way pull a gun from a holster while arguing with his girlfriend. *Wooden*, 551 F.3d at 648. The Court of Appeals relied on the need for dispatch in responding to a crime in progress reported by an anonymous eyewitness to find that a *Terry* stop was supported by reasonable suspicion. *Id.* at 650. Similarly, *United States v. Hicks*, 531 F.3d 555 (7th Cir. 2008), an identified 911 caller reported an armed man was in the process of beating a women. *Id.* at 556. The Court of Appeals held there was reasonable suspicion because the informant identified himself and reported an ongoing emergency, and the subject matched the description given to the law enforcement officer that stopped him. *Id.* at 560.

It is a close call whether the informant's tip, by itself, was sufficient to create reasonable suspicion to search Washington. Unlike *J.L.*, Washington's reported possession of a firearm was in a chaotic, high crime area and constituted an ongoing crime because Illinois law does not

allow the carrying of concealed weapons. *See* 720 ILCS 5/24-1(a)(4).[3]  Nevertheless, the need

for dispatch in this case does not appear to have been as serious as it was in *Wooden, Hicks* or

*Drake*.  The informant's report to Williams was only that Washington had a gun, not that he was

brandishing it, using it or threatening to use it in an ongoing situation that urgently called for

emergency action.  However, unlike the informant in *J.L.*, the informant in this case was an

eyewitness to the criminal activity he reported and had given an accurate report of the car and its

location, which weighs in favor of his reliability.  Additionally, although the informant did not

give his name, he was not purely anonymous;  Williams was able to observe him (even if he did

not know his name) and make an assessment about his credibility, and he could possibly

recognize him again if he came across him.  These factors would weigh in favor of the

informant's reliability as well.

        However, the Court need not decide whether the informant's tip alone would have been

enough to provide reasonable suspicion because the totality of the circumstances satisfies that

standard. In addition to the tip from an eyewitness informant Williams judged to be credible

even though anonymous, Washington was a large but not obese black male wearing a white tee

shirt, which appeared to Williams to match the informant's description since Williams believed

the black jacket had been shed and placed in the car.  Additionally, Washington stared intently at

Williams while he was looking at the car from which the informant said the gun was taken and

---

[3]720 ILCS 5/24-1(a)(4) states, in pertinent part:

> A person commits the offense of unlawful use of weapons when he
> knowingly. . . [c]arries or possesses . . . concealed on or about his person
> except when on his land or in his own abode, legal dwelling, or fixed
> place of business, or on the land or in the legal dwelling of another person
> as an invitee with that person's permission, any . . . firearm. . . .

walked away after making eye contact with Williams.  Washington turned back to look at the officers following him and quickened his pace to increase his distance from them, indicating he was trying to evade the officers.  While it is true that this conduct by itself is not enough to find reasonable suspicion,  *see United States v. Patterson*, 340 F.3d 368, 372 (6th Cir. 2003), such conduct can be a factor considered in the totality of the circumstances.  Williams was trained and experienced in street crimes, and the Don Taco parking lot area at that time of the night was a chaotic, high crime area, all of which informed Williams' opinion about whether Washington was concealing a weapon or was otherwise dangerous. The foregoing was sufficient to create reasonable suspicion to stop Washington.

Once Williams stopped Washington, Washington appeared nervous, glanced toward his waistband and worked his hands toward his pockets, which added to Williams' reasonable suspicion that Washington possessed a gun in his waistband as described by the informant. "[N]ervous or evasive behavior 'is a pertinent factor in determining reasonable suspicion.'" *United States v. Oglesby*, 597 F.3d 891 (7th Cir. 2010) (quoting *Illinois v. Wardlow,* 528 U.S. 119, 124 (2000)).  In light of the totality of the circumstances described above, there was reasonable suspicion to support the *Terry* stop of Washington, including the pat-down search that located the gun.

*United States v. Keith*, 559 F.3d 499 (6th Cir. 2009), does not mandate that there was no reasonable suspicion.  In *Keith*, a police officer made a stop based on the fact that the defendant and a friend moved behind a building out of view of officers and looked back twice in the direction of the officers' flashing police lights at a late hour and in a bad neighborhood.  *Id.* at 506.  Here, there is far more to arouse suspicion than simply disappearing from view for a few seconds and looking back at the police.

This case is much more like *United States v. Oglesby*, 597 F.3d 891 (7th Cir. 2010). In that case, a group of men was obstructing the sidewalk (which violated a city ordinance) in a high crime district. *Id.* at 892. An officer saw Oglesby "backing away from [two other officers] while looking from side to side" and "repeatedly lower his right hand to his right side, and noted Oglesby's angled stance [obstructing the view of his right side]." *Id.* at 893. The Court of Appeals found the officer had reasonable suspicion to conduct a pat-down search due, in part, to Oglesby's nervous and evasive behavior. *Id.* at 894-95.

Washington also argues that his stop and search was the result of racial profiling. While racial profiling is not permitted, this *Terry* stop was not conducted solely on the basis of race (as indicated by the multiple factors listed above as supporting reasonable suspicion). To the extent race was a factor, it was one of several factors used by the informant to identify the person who retrieved the gun from the car. Furthermore, there does not seem to be any indication that race was the *only* factor used by the officers to identify the subject. They did not stop or search every black person in the area – or even every black man – but only those they believed matched the informant's description or those who consented to be searched.

**III.    Conclusion**

For the foregoing reasons, the Court finds that, considering the totality of the circumstances, Williams had reasonable suspicion of criminal activity to justify his stopping and patting down Washington for a weapon. Accordingly, the Court **DENIES** the motion to suppress (Doc. 47).

**IT IS SO ORDERED.**
**DATED:  October 24, 2011**

s/ J. Phil Gilbert_____
**J. PHIL GILBERT**
**DISTRICT JUDGE**